## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WORCESTER INTERFAITH, INC.; NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, INC., WORCESTER BRANCH; CASSANDRA BENSAHIH; JAMES BERRY; MARITZA CRUZ; HOLLI HILL; JESSENIA KOLACO; NELLY MEDINA; RUTH RODRIGUEZ-FAY; and DELIA VEGA,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>CITY OF WORCESTER, MASSACHUSETTS; EDWARD M. AUGUSTUS, JR., in his official capacity as Worcester City Manager; NIKOLIN VANGJELI, in his official capacity as Worcester City Clerk; WORCESTER SCHOOL COMMITTEE; JOSEPH M. PETTY, in his official capacity as Mayor of the City of Worcester, City Councilor, and Chairman of the Worcester School Committee; DIANNA L. BIANCHERIA, LAURA CLANCEY, JOHN L. FOLEY, MOLLY O. MCCULLOUGH, JOHN F. MONFREDO, and TRACY O'CONNELL NOVICK, in their official capacities as members of the Worcester School Committee; WORCESTER BOARD OF ELECTION COMMISSIONERS; RICHARD DUFFY, KIMBERLY VANDERSPEK, WINIFRED OCTAVE, DANAAH MCCALLUM, and JOHN STEWART, in their official capacities as members of the Worcester Board of Election Commissioners; WORCESTER CITY COUNCIL; MORRIS A. BERGMAN, DONNA M. COLORIO, KHRYSTIAN E. KING, CANDY MERO-CARLSON, SARAI RIVERA, SEAN M. ROSE, GARY ROSEN, GEORGE J. RUSSELL, KATHLEEN M. TOOMEY, and MATTHEW E. WALLY, in their official capacities as City Councilors,<br><br>　　　　Defendants. | Case No. _____<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      "Few rights are more sacred than the right to vote."[1]   Indeed, the right to vote "in a free and unimpaired manner is preservative of other basic civil and political rights."[2]   The Voting Rights Act ("VRA") was passed in 1965 in order to safeguard this essential right for all Americans, regardless of color, and address the "accumulated wrongs and the continuance of the wrongs" related to discrimination in voting.[3]

2.      Plaintiffs are members of the large and growing communities of color in the city of Worcester, Massachusetts, the second-largest city in New England, and organizations made up of those individuals.   In this suit, they are seeking enforcement of the federal laws that protect their fundamental right to vote.

3.      Specifically, Plaintiffs challenge Worcester's at-large plurality electoral system for School Committee elections, which unlawfully and unconstitutionally dilutes the vote of the Hispanic/Latino/a and Black communities in Worcester and deprives them of an equal opportunity to elect candidates of their choice to represent them on the Worcester School Committee.

4.      The Hispanic/Latino/a and Black communities of Worcester constitute a significant portion of the population.   According to U.S. Census Data, as of 2018, Hispanic/Latino/a and Black residents make up more than one-third of Worcester's total population, a figure which has grown exponentially in recent decades and continues to grow rapidly.

5.      The student population of Worcester Public Schools is even more diverse: in the 2019-20 school year, 60% of students enrolled in Worcester Public Schools were either

---

[1] *Clerveaux v. E. Ramapo Cent. Sch. Dist.*, 984 F.3d 213, 218 (2d Cir. 2021).
[2] *See* S. REP. 97-417, at 19 (1982), *as reprinted in* 1982 U.S.C.C.A.N. 177, 197, *available at* 1982 WL 25033 (the "Senate Report").
[3] *Id.* at 5, *as reprinted in* 1982 U.S.C.C.A.N. 177, 182.

Hispanic/Latino/a or Black.  Yet the Worcester School Committee, which is the legislative and policy-making body charged with supervision of the Worcester Public Schools, is currently all-white and has been dominated by white members in recent history.

6.      The Worcester School Committee's lack of diversity is a direct result of its at-large plurality electoral system.  In an at-large plurality winner-take-all system such as Worcester's, 51% of the electorate can control all the seats and win every election.  This is precisely what is occurring in Worcester.   Voting patterns show demonstrable racial polarization, with a predominantly white majority that generally votes for the same candidates, effectively diluting and canceling out the votes of Hispanic/Latino/a and Black residents.  This is directly counter to the fundamental principle of equal voting opportunity, and a violation of federal law.

7.      The lack of diversity on Worcester's School Committee has had, and continues to have, a detrimental impact on the communities of color whose votes are diluted.  Worcester's communities of color struggle in their efforts to convince the Worcester School Committee to take action on matters that are important to those communities.  As one example, for the past several years the Hispanic/Latino/a and Black communities together have repeatedly sought to have the School Committee address the Worcester Public Schools' student discipline rates, which are extremely high and disproportionately directed at students of color.  These concerns have not been addressed, and the disparate school discipline problem continues.

8.      Because the Worcester School Committee members do not need the minority communities' votes to maintain their positions given the at-large plurality election system, the School Committee members need not be (and indeed, are not) responsive to minority communities' needs or concerns.

9.      Worcester's unlawful electoral system has denied Hispanic/Latino/a and Black residents in the City of Worcester an equal opportunity to elect candidates of their choice to the Worcester School Committee.  The use of an exclusively at-large plurality voting system for all six seats (plus the Mayor's seat) causes the combined electoral strength of predominantly white candidates from neighborhoods with the largest percentage of white voters to deprive Plaintiffs, and other Hispanic/Latino/a and Black voters, of equal voting power and prevent them from electing candidates of their choice in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301 ("Section 2"), as well as the Fourteenth and Fifteenth Amendments to the United States Constitution.  This violation will continue as long as the at-large plurality electoral system is in place.

10.     Under a reasonable and properly apportioned single-member districting plan, at least one single-member district in Worcester can be created for the Worcester School Committee in which Hispanic/Latino/a and Black residents combined would comprise a majority of the total population, voting age population, and citizen voting age population.

11.     Under the totality of the circumstances, including the historical, socio-economic, and other conditions that prevail in Worcester, the at-large plurality election system used to elect the Worcester School Committee violates Section 2 of the VRA, as well as the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Fifteenth Amendment to the United States Constitution.

12.     For these reasons, and as further alleged in detail below, Plaintiffs seek, among other things, declaratory judgment and injunctive relief prohibiting any further utilization of an entirely at-large plurality system for electing members of the Worcester School Committee, and

ordering the implementation of a new method of election for the Worcester School Committee that complies with the VRA and the United States Constitution.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1343(a), because this action seeks to redress the deprivation, under color of state law, of rights, privileges and immunities secured by the Voting Rights Act; and 28 U.S.C. § 1331, because this action arises under the laws of the United States.

14.     This Court has jurisdiction to grant both declaratory and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202.

15.     This Court has personal jurisdiction over the Defendants, all of whom reside in this district.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims herein occurred in this district and because the Defendants reside in this district.

## PARTIES

### Plaintiffs

17.     Plaintiff Worcester Interfaith, Inc. ("Worcester Interfaith") is a Massachusetts nonprofit corporation with a principal place of business at 111 Park Avenue, Worcester, Massachusetts 01609.  Worcester Interfaith develops leaders and organizes power to work for racial and economic justice and change.  It is a collective of congregations and community-based organizations in Worcester, Massachusetts which represent the racial, socio-economic, and geographic diversity of the city.  It leverages community support and funding for local schools, infrastructure improvements, workforce development, employment opportunities, pools, and parks and recreation, while advocating for policy changes at the local and state levels.  Worcester

Interfaith's members include Hispanic/Latino/a and Black residents of Worcester whose votes are diluted by the at-large plurality School Committee election system.  Ensuring that the interests of communities of color are adequately represented with respect to Worcester Public Schools is germane to Worcester Interfaith's purpose, and Worcester Interfaith has devoted resources to combatting the disparate effects of the at-large plurality system on communities of color and, in particular, students of color in Worcester Public Schools.

18.     Plaintiff National Association for the Advancement of Colored People, Inc., Worcester Branch ("NAACP") is a Delaware corporation with a principal place of business at 4805 Mt. Hope Drive, Baltimore, Maryland 21215.  The branch of the NAACP for the City of Worcester, Worcester Unit #2058, has a business address of 4 East Central St., #484, Worcester, Massachusetts 01613.  The NAACP's mission is to secure the political, educational, social, and economic equality of rights in order to eliminate race-based discrimination and ensure the health and well-being of all persons, and one of its objectives is to seek enforcement of federal, state, and local laws securing civil rights.  NAACP's members include Black and Hispanic/Latino/a residents of Worcester whose votes are diluted by the at-large plurality School Committee election system. Ensuring that the interests of communities of color are adequately represented with respect to Worcester Public Schools is germane to NAACP's purpose, and NAACP has devoted resources to combatting the disparate effects of the at-large plurality system on communities of color and, in particular, students of color in Worcester Public Schools.

19.     Plaintiff Cassandra Bensahih is a Black resident of Worcester and a registered voter.  As a result of Worcester's at-large plurality School Committee election system, Ms. Bensahih is denied the equal opportunity to elect candidates of her choice to the Worcester School Committee.

20.     Plaintiff James Berry is a Black resident of Worcester and a registered voter.  As a result of Worcester's at-large plurality School Committee election system, Mr. Berry is denied the equal opportunity to elect candidates of his choice to the Worcester School Committee.

21.     Plaintiff Maritza Cruz is a Hispanic/Latina resident of Worcester and a registered voter.  As a result of Worcester's at-large plurality School Committee election system, Ms. Cruz is denied the equal opportunity to elect candidates of her choice to the Worcester School Committee.

22.     Plaintiff Holli Hill is a Black resident of Worcester and a registered voter.  As a result of Worcester's at-large plurality School Committee election system, Ms. Hill is denied the equal opportunity to elect candidates of her choice to the Worcester School Committee.

23.     Plaintiff Jessenia Kolaco is a Black resident of Worcester and a registered voter. As a result of Worcester's at-large plurality School Committee election system, Ms. Kolaco is denied the equal opportunity to elect candidates of her choice to the Worcester School Committee.

24.     Plaintiff Nelly Medina is a Hispanic/Latina resident of Worcester and a registered voter.  As a result of Worcester's at-large plurality School Committee election system, Ms. Medina is denied the equal opportunity to elect candidates of her choice to the Worcester School Committee.

25.     Plaintiff Ruth Rodriguez-Fay is a Hispanic/Latina resident of Worcester and a registered voter.  As a result of Worcester's at-large plurality School Committee election system, Ms. Rodriguez-Fay is denied the equal opportunity to elect candidates of her choice to the Worcester School Committee.

26.     Plaintiff Delia Vega is a Hispanic/Latina resident of Worcester and a registered voter.  As a result of Worcester's at-large plurality School Committee election system, Ms. Vega

is denied the equal opportunity to elect candidates of her choice to the Worcester School Committee.

## Defendants

27.     Defendant City of Worcester (the "City") is a city in the Commonwealth of Massachusetts.

28.     Defendant Edward M. Augustus, Jr. is the appointed City Manager of the City of Worcester.  Mr. Augustus is sued in his official capacity.

29.     Defendant Nikolin Vangjeli is the City Clerk for the City of Worcester.  Mr. Vangjeli is sued in his official capacity.

30.     Defendant Worcester School Committee is responsible for the conduct of the public schools for the City of Worcester.  *See* M.G.L. c. 43, § 95.  The Worcester School Committee members are elected biennially by city-wide at-large plurality elections held in odd numbered years.

31.     Defendant Joseph M. Petty is the Mayor of the City of Worcester, Massachusetts, a City Councilor, and Chairman of the Worcester School Committee.  He is sued in each of his official capacities.

32.     Defendants Dianna L. Biancheria, Laura Clancey, John L. Foley, Molly O. McCullough, John F. Monfredo, and Tracy O'Connell Novick are members of the Worcester School Committee.  Each of these Defendants is sued in his or her official capacity.

33.     Defendant Worcester Board of Election Commissioners is responsible for managing and conducting all municipal, state, and federal elections within the City of Worcester.

34.     Defendants Richard Duffy, Kimberly Vanderspek, Winifred Octave, Danaah McCallum, and John Stewart are members of the Worcester Board of Election Commissioners. Each of these Defendants is sued in his or her official capacity.

35.     Defendant Worcester City Council exercises the legislative powers of the City of Worcester, Massachusetts and is empowered pursuant to M.G.L. c. 43b, § 10 to amend the City Charter, which dictates that School Committee members are elected at-large.

36.     Defendants Morris A. Bergman, Donna M. Colorio, Khrystian E. King, Candy Mero-Carlson, Sarai Rivera, Sean M. Rose, Gary Rosen, George J. Russell, Kathleen M. Toomey, and Matthew E. Wally are members of the Worcester City Council.  Each of these Defendants is sued in his or her official capacity.

## FACTS

37.     In this action, Plaintiffs will demonstrate the dilution of the votes of the Hispanic/Latino/a and Black residents of Worcester with respect to School Committee elections. The majority of Worcester Public School students are students of color.  City-wide, communities of color constitute a significant portion of the voting population.  However, voters of color have historically been unable to elect candidates of their choice to the School Committee.  The School Committee is currently all-white.  Over the last six election cycles (2009-2019), out of 36 open seats, only one seat has been won by a candidate of color (Hispanic/Latina), and her tenure was limited to one term.  In the last decade, there have been no Black School Committee members at all, despite several running for election.  This is the direct result of the entirely at-large plurality School Committee election system, combined with the historical, socio-economic, and other conditions which prevail in Worcester and which hinder the ability of residents of color to fully participate in the political process.

### Worcester School Committee Election System

38.     The Worcester School Committee is the legislative and policy-making body charged with supervision of the Worcester Public School System.  Under Chapter 71, Section 37 of the Massachusetts General Laws, it "shall have the power to select and to terminate the

superintendent, shall review and approve budgets for public education in the district and shall establish educational goals and policies for the schools in the district consistent with the requirements of law and statewide goals and standards established by the Massachusetts Board of Education." The School Committee is made up of seven members – (i) the six members who are elected in the at-large plurality School Committee election; and (ii) the Mayor, who is elected by being the top vote-getting mayoral candidate among those who also finished among the top six at-large candidates in the Worcester City Council race. The Mayor does not compete against the School Committee candidates.

39.     All six members elected in the Worcester School Committee election are elected at-large, city-wide, in a plurality voting system for two-year terms, with the biennial election taking place in every odd-numbered year. At the polls, Worcester voters are presented with a list of candidates for School Committee and may vote for up to six total School Committee candidates. The top six vote-getting candidates are elected to the Worcester School Committee.

40.     Although the city is currently divided into five separate districts for purposes of electing City Councilors, its voters vote as a whole in the School Committee's at-large, plurality winner-take-all election system. Accordingly, only the top vote-getting candidates across the entire city win seats on the Worcester School Committee. Because the city effectively votes as a single entity, a majority bloc of voters can elect all of its preferred candidates to the Worcester School Committee. This election system dilutes the voting power of Worcester's Hispanic/Latino/a and Black communities, who have experienced a systemic failure of representation.

**Worcester Demographics**

41.    The City of Worcester has seen significant growth in its non-white populations in

recent years.  In 1980, for example, only 8.2% of Worcester's population identified as non-white.[4]

Today, however, Worcester's non-white population makes up nearly 44% of the City's residents.[5]

This growth is depicted in the charts below.



42.    The student population of Worcester Public Schools is even more diverse than the

city as a whole.  In the 2019-20 school year, the student population of Worcester Public Schools

was  43.1%  Hispanic/Latino/a,  29.1%  white,  and  16.9%  Black/African  American.  Thus,

Hispanic/Latino/a and Black students constitute a significant majority (~60%) of the Worcester

---

[4] United States Census Bureau, *Massachusetts – Race and Hispanic Origin for Selected Large Cities and Other Places: Earliest Census to 1990*, CENSUS.GOV, https://web.archive.org/web/20121018075318/http://www.census.gov/population/www/document ation/twps0076/MAtab.pdf (last visited Jan. 20, 2021).

[5] United States Census Bureau, *Citizen Voting Age Population by Race and Ethnicity (CVAP) Special  Tabulation*,  CENSUS.GOV  (Oct.  30.  2020),  https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2018.html (last visited Jan. 20, 2021).

Public School population, yet there is currently not a single Hispanic/Latino/a or Black member of the Worcester School Committee.

43.     City-wide, the Hispanic/Latino/a and Black communities also constitute a significant portion of the population.  According to the U.S. Census Bureau's 2014-2018 American Community Survey published in February 2020, 21.3% of Worcester residents identify as Hispanic or Latino and 12.1% of Worcester residents identify as Black or African American.   A slim majority of Worcester residents, 56.6%, identify as non-Latino whites.[6]

44.     This reflects an increase in Worcester's Hispanic/Latino/a and Black populations of 574% and 500%, respectively, as compared to the population in 1980.  Worcester's white population has *decreased* by nearly 30% over the same time period.  However, the Worcester School Committee has not reflected the changing demographics of the City.

### Lack of Minority Representation in Worcester

45.     Worcester's communities of color, making up nearly half of its population, and a clear majority of its public school students, have had almost no representation on the School Committee.  The majority white electorate in the city-wide at-large plurality School Committee electoral system has all but extinguished minorities' opportunities to elect their chosen representatives.

46.     Currently, there is not a single Hispanic/Latino/a or Black person serving on the Worcester School Committee.  The white School Committee members have dominated the top spots in recent election cycles despite the City's significant minority population.  For example,

[6] United States Census Bureau, *Citizen Voting Age Population by Race and Ethnicity (CVAP) Special Tabulation*, CENSUS.GOV (Oct. 30. 2020), https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.2018.html (last visited Jan. 20, 2021).

Defendants Foley, Biancheria, and Monfredo, all of whom are white, have each served at least six consecutive terms on the Worcester School Committee. Defendant Petty, who is also white and holds a seat on the Worcester School Committee by virtue of his position as Mayor, has served five consecutive terms.

47.     During this time, multiple minority candidates have attempted to win a place on the Worcester School Committee, but only one has been successful. After advocating for issues particularly important to Worcester's communities of color, that minority member was limited to only one term. The below charts demonstrate the drastic difference between the diversity of the Worcester School Committee over the last decade and the current diversity of the Worcester Public School student population.



48.     Hispanic/Latina candidate Hilda Ramirez served one term on the Worcester School Committee from 2013-2015, narrowly winning office by receiving the sixth highest number of votes in that election cycle. Once on the School Committee, Ms. Ramirez raised issues important to communities of color, including bilingual education and the manner in which Worcester Public Schools over-disciplined students of color. In the next election cycle, she was unable to hold onto

her seat and lost her re-election bid, despite receiving 63% of votes in the ten most diverse precincts in the City.[7]

49.   In the 2019 election, at least three of the twelve candidates for Worcester School Committee were candidates of color.  A number of these candidates received strong support from communities of color, yet none were successful in receiving enough votes city-wide to win a seat.

50.   White voters have successfully elected their candidates of choice for School Committee, while the preferred candidates of minority voters fail to win unless they are likewise supported by white voters, a fact exemplified by analyzing how candidates fared in the least and most diverse precincts in the City.  In 2019, for example, the top six vote-getters in the ten whitest precincts in the City all won election, and all are white.  By contrast, candidates of color who were strongly supported in the ten most diverse precincts in the City all were unable to secure enough votes city-wide to win office.

51.   Upon information and belief, most successful School Committee candidates have traditionally been residents of predominantly white districts located on the west side of the City.

52.   The vote dilution that occurs through the at-large system of electing School Committee members can also be seen by contrasting it with Worcester City Council elections, which have a combination of at-large and district-based seats.[8]   In City Council elections, particularly those for district seats, minority (and minority backed) candidates have fared better. For example, Dr. Sarai Rivera, the District 4 Councilor, is serving her fifth consecutive two-year

---

[7] The City is divided into ten separate wards, with each ward encompassing five precincts.

[8] Plaintiffs do not concede that the current method of electing Worcester's City Council is legal. In particular, the large number of at-large seats compared to district seats raises questions about whether that electoral system also violates the law.  Plaintiffs' point here is only to illustrate how districts can enhance the opportunity of communities of color to elect candidates of their choice – an opportunity that is completely absent for School Committee elections.

term on the City Council. Dr. Rivera is Hispanic/Latina. As of December 2019, Hispanic/Latino/a and Black residents combined constituted approximately 49% of the total population, 44% of the voting age population, and 41% of the City Council District 4 citizen voting age population of City Council District 4. By comparison, 27% of the city-wide citizen age voting population identifies as Hispanic/Latino/a or Black.

53.     This concentration of minority voters within District 4, and the success of Dr. Rivera at the polls, demonstrates that district-based voting strengthens the ability of minority voters to elect their candidates of choice.

54.     If the Worcester School Committee followed a district-based voting system rather than the current at-large plurality voting system, Hispanic/Latino/a and Black voters together could constitute a majority-minority population in at least one reasonably apportioned district, thereby increasing their opportunity to elect candidates of their choice to the Worcester School Committee.

55.     Instead, the at-large plurality scheme used to elect the Worcester School Committee denies Worcester's Hispanic/Latino/a and Black residents an equal opportunity to participate in the political process and elect representatives of their choice.

**Worcester's School Committee Election System Violates Section 2 of the Voting Rights Act**

56.     Worcester's at-large plurality School Committee election system violates Section 2 of the Voting Rights Act under the Supreme Court's vote dilution test in *Thornburg v. Gingles*, 478 U.S. 30 (1986).

57.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301(a) ("Section 2"), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." A Section 2 violation is established if it is shown that "the political processes leading to nomination or election" in the jurisdiction "are

not equally open to participation by [a minority] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id.* § 10301(b). An electoral system that dilutes the voting strength of minority communities may deprive the members of those communities of an equal opportunity to elect representatives of their choice in violation of Section 2.

58.     In *Gingles*, the Supreme Court identified three necessary preconditions to support a claim of vote dilution under Section 2: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) the minority group must be "politically cohesive"; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." 478 U.S. at 50-51.

59.     If these preconditions are satisfied, a plaintiff must then show that, under the totality of the circumstances, the members of the minority group have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. *See id.* at 44-45. When considering the totality of the circumstances, the Supreme Court adopted the factors enumerated by the United States Senate when passing the VRA, which include:

- a history of voting-related discrimination in the political subdivision;

- the extent to which voting is racially polarized within the political subdivision;

- the extent to which voting practices or procedures tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts and majority vote requirements;

- the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process;

- whether political campaigns have been characterized by overt or subtle racial appeals;

- the extent to which members of the minority group have been elected to public office in the jurisdiction;

- evidence demonstrating that elected officials are unresponsive to the particularized needs of the members of the minority group; and

- evidence showing the policy underlying the political subdivision's use of the contested election practice or structure is tenuous.

*See id.* at 36-37, 44-45.

60.     Coalitions of minority groups that exhibit political cohesion and that otherwise satisfy the vote dilution test in *Gingles* may sustain a vote dilution action under Section 2.  *See, e.g.*, *Clerveaux*, 984 F.3d at 237 (affirming District Court's finding that Black and Latino voters were politically cohesive in satisfaction of *Gingles*); *Concerned Citizens of Hardee Cty. v. Hardee Cty. Bd. Of Comm'rs*, 906 F.2d 524, 526 (11th Cir. 1990); *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1244 (5th Cir. 1988), *cert. denied* 492 U.S. 905 (1989); *Huot v. City of Lowell*, 280 F. Supp. 3d 228 (D. Mass. 2017).

61.     Worcester's Hispanic/Latino/a and Black voters together satisfy both the preconditions and the totality of the circumstances tests under *Gingles* because they have less opportunity than other members of the electorate to participate in the political process and elect candidates of their choice to the Worcester School Committee.

**Hispanic/Latino/a and Black Residents Are Sufficiently Large and Geographically Compact to Constitute a Majority in a Single-Member District**

62.     Worcester's Hispanic/Latino/a and Black residents together are sufficiently numerous and geographically compact to form a majority of the total population, voting age population, and citizen voting age population in at least one district of a reasonable and properly apportioned district-based election system.

63.     It is possible to draw districting maps for the City of Worcester in which Hispanic/Latino/a and Black residents would form a majority of the population in at least one reasonable and properly apportioned single-member district for the Worcester School Committee.

For example, a district centered around the current City Council District 4 and roughly bounded by the Main South, Vernon Hill, City Center, Water St/Grafton St, South Worcester, Chandler St/Park Ave, University Park, Park Ave/Main St, Webster Square, Piedmont, and Beacon Brightly neighborhoods of Worcester can be drawn that satisfies this precondition.

### Hispanic/Latino/a and Black Residents are Politically Cohesive and Majority Bloc Voting Usually Defeats Their Preferred Candidates

64.     Worcester's Hispanic/Latino/a and Black voters are politically cohesive as a coalition minority group.  They consistently tend to vote together in support of candidates of their choice, particularly candidates of color.   These candidates are heavily favored by Hispanic/Latino/a and Black voters over different candidates favored by Worcester's remaining voters, who are predominantly white.

65.     Historically, and particularly in recent years, the Hispanic/Latino/a and Black communities have joined forces to advocate for issues important to both communities, most notably with respect to educational justice and equity.  As a result, they tend to support the same candidates (often candidates of color) in School Committee elections.

66.     Worcester's predominantly white majority electorate effectively votes as a bloc in support of candidates different than those supported by Hispanic/Latino/a and Black voters together.  Voting by the predominantly white majority consistently defeats the candidates preferred by Hispanic/Latino/a and Black voters.  This generally explains why, despite strong support from Worcester's Hispanic/Latino/a and Black voters, candidates of color have been consistently defeated by white opponents.

67.     An analysis of recent election results confirms that, despite the political cohesion of Worcester's Hispanic/Latino/a and Black voters, these voters are unable to elect candidates of

their choice under Worcester's unlawful at-large School Committee election scheme and the strength of Worcester's predominantly white majority electorate.

68.     In 2019, Jermoh Kamara and Chantel Bethea, two Black candidates, ran for Worcester School Committee.  Ms. Kamara and Ms. Bethea were the second and third most popular candidates among the ten most diverse precincts in Worcester,[9] but in the ten whitest precincts, neither Ms. Kamara nor Ms. Bethea placed in the top six preferred candidates.  Due to the lack of support from white voters, neither Ms. Kamara nor Ms. Bethea were elected. Stunningly, a white candidate who died two weeks before the election nonetheless received more votes than a third minority candidate, Mariah Lizmari Martinez, and nearly as many votes as Ms. Bethea.[10]

69.     As another example, in 2015, Hilda Ramirez, a Hispanic/Latina candidate, was an incumbent seeking re-election, having been elected for the first time in 2013.  Ms. Ramirez, the only candidate of color in that election cycle, was overwhelmingly the most preferred candidate by voters in the ten most diverse precincts in Worcester, receiving votes from 63% of voters in those precincts, with the next most popular candidate in these ten precincts receiving votes from only 46% of voters.  Voters of color supported Ms. Ramirez; during her single term on the Worcester School Committee she often tried to address issues disparately impacting students of color, such as bilingual education and the disproportionate number of students of color being suspended or otherwise disciplined in Worcester Public Schools.  Yet despite having the advantage

---

[9] John Foley was the most preferred candidate by both white voters and minority voters.  With the support of the white electorate, he won re-election.

[10] Notably, this election occurred before "early voting" or "mail-in voting" became commonplace as it did in the 2020 election cycle.

of incumbency and overwhelming support from voters of color, Ms. Ramirez was not re-elected, finishing eighth among the ten School Committee candidates.

70.     As demonstrated above, Worcester's city-wide at-large School Committee election system allows the predominantly white majority electorate to deny Hispanic/Latino/a and Black voters the equal opportunity to elect representatives of their choice.

## Voting in Worcester is Racially Polarized and Almost No Hispanic/Latino/a and Black Candidates Have Been Elected to Worcester School Committee

71.     The totality of the circumstances demonstrates that Hispanic/Latino/a and Black voters together have less opportunity than other members of the electorate to participate in the political process and to elect candidates of their choice to the Worcester School Committee.

72.     For example, as explained above, voting in Worcester is highly racially polarized. Hispanic/Latino/a and Black voters frequently support the same candidates, and those candidates are routinely defeated by the preferred candidates of the predominantly white majority electorate. Hispanic/Latino/a and Black candidates also receive little to no support from the white majority electorate.

73.     As explained above, the School Committee is currently all-white.  Over the last six election cycles (2009-2019), out of 36 open seats, only one seat has been won by a candidate of color (Hispanic/Latina), and her tenure was limited to one term.  In the last decade, there have been no Black School Committee members at all, despite several running for election.

## The Worcester School Committee's At-Large Plurality Voting Scheme Enhances Opportunities for Discrimination Against Hispanic/Latino/a and Black Voters

74.     Worcester's use of a city-wide at-large plurality School Committee election scheme enhances opportunities for discrimination against Hispanic/Latino/a and Black voters.  Using a single city-wide district for School Committee elections in which all voters are permitted to vote

for up to six candidates enables the predominantly white majority electorate to elect the candidates of its choice, and to defeat the preferred candidates of Hispanic/Latino/a and Black voters.

75.     As described in more detail in other sections of this complaint, candidates elected by the predominantly white majority electorate are less responsive to the needs and concerns of minority communities in Worcester; they do not need support from those communities to win election.

76.     Notably, former Worcester School Committee member Dante Comparetto, after being elected in 2017, candidly conceded that running for School Committee is still "an opportunity not afforded to a lot of people of color, frankly."[11]

77.     Mr. Comparetto in fact decided not to run for re-election for School Committee as a result of what he described as unchecked racism in the schools (and the City at large), as well as the Worcester School Committee's decision in May 2019 to award a new three-year contract to the Superintendent, over the repeated objections of the Hispanic/Latino/a and Black communities.[12]

78.     By contrast, where School Committees are more diverse, and more accountable to communities of color, this yields positive results.  A report by the Massachusetts Institute for a New Commonwealth ("MassINC") found: "Studies show that parents of color feel better about the performance of their schools when they live in districts with minority school committee members. Other research suggests that they have good reason for such confidence: Students of

---

[11] Scott O'Connell, *Lack of school panel diversity examined: Members say committee still able to adequately represent minority students, families*, Worcester Telegram & Gazette, Feb. 22, 2019 at A1.

[12] Scott O'Connell, *Liberal complacency vexes Comparetto: First-term School Committee member won't seek re-election this fall*, Worcester Telegram & Gazette, May 14, 2019 at B1.

color who attend schools in districts with minority school committee members are less likely to be suspended, expelled or enrolled in special education, and more likely to take higher-level classes."[13]

79.     Worcester's current system of electing School Committee members, however, enhances opportunities for discrimination by making it more difficult for members of communities of color to elect their preferred candidates and to hold elected School Committee members accountable on issues of importance to communities of color.

### History of Voting Related Discrimination in Worcester

80.     There is a well-documented history of voting problems for minorities in Worcester.

81.     For example, in 2011, the Worcester City Council approved a nonbinding referendum on the municipal ballot to ask the voters' opinion on whether the School Committee should have a combination of at-large members and district members, similar to the makeup of the City Council.  Notably, four members of the School Committee at the time – including Defendant Monfredo, who is still on the School Committee today – publicly opposed allowing Worcester residents to vote on the ballot measure.[14]

82.     Unsurprisingly, given that the measure was voted on a city-wide basis in a city where racially polarized voting patterns persist, the measure was defeated 52% to 48%.  According to local publications, support for changing the School Committee was strongest in east side and

---

[13] Benjamin Forman, et al., *Local Accountability: An Untapped Strategy for Advancing Student Achievement in Massachusetts Public* Schools, MassINC Policy Reports, Feb. 2019, at 41; *see also* Scott O'Connell, *Lack of diversity on Worcester School Committee a problem, some people of color say*, Worcester Telegram & Gazette, Feb. 21, 2019.

[14] Nick Kotsopoulos, *Voters' advice to be sought on board makeup*, Worcester Telegram & Gazette, Sept. 14, 2011 at A1.

central city precincts, where communities of color are highly concentrated, while voters in the predominantly white west side of the City were strongly opposed.[15]

83.     In October 2019, the Mayor's Commission on Latino Education and Advancement proposed several possible changes aimed at addressing racial equities in schools, including "finding a new way of electing School Committee members, possibly by switching to a district-based rather than at-large format."[16]  Former School Committee member Dante Comparetto (who, as explained above, did not seek re-election in part due to his frustration with the Committee's refusal to address issues specific to communities of color), also formally requested "that the Mayor consider alternative methods to electing and appointing School Committee members that includes, but is not limited to, district School Committee seats."[17]  Despite the significant support for these proposals, they have not been acted upon.

**Worcester Communities of Color Bear the Effects of Past Discrimination in Education**

84.     "Congress intended that the Voting Rights Act eradicate inequalities in political opportunities that exist due to the vestigial effects of past purposeful discrimination . . . [and] participation by minorities tends to be depressed where minority group members suffer effects of prior discrimination such as inferior education, poor employment opportunities, and low incomes." *Gingles*, 478 U.S. at 69.

---

[15] Nick Kotsopoulos, *Voters nix ballot on school board change*, Worcester Telegram & Gazette, Nov. 9, 2011 at B5.

[16] Scott O'Connell, *Latino panel unveils draft plan to rebuild trust, equity*, Worcester Telegram & Gazette, Oct. 29, 2019 at A1.

[17] Clerk of the Worcester School Committee, *Agenda #20 Minutes of the School Committee Meeting of November 21, 2019*, WORCESTERSCHOOLS.ORG, https://worcesterschools.org/wp-content/uploads/2019/11/Agenda-20-School-Committee-November-21-2019-1.pdf (last visited Jan. 20, 2021).

85.     Members of minority communities in Worcester, including the Hispanic/Latino/a and Black communities, bear the effects of past discrimination in education, which hinders their ability to participate effectively in the political process.

86.     For example, in 1978, a class action lawsuit was brought against Worcester Public Schools contending that it failed to provide adequate educational services for Hispanic/Latino/a students of limited English proficiency.[18]  In 1983, a consent decree was entered, pursuant to which this Court ordered various improvements to the bilingual education program in Worcester Public Schools.  These improvements included the development of a comprehensive curriculum for all classes of bilingual education, the provision of textbooks and materials for adequate bilingual teaching, the availability of bilingual counseling and administrative personnel, and certain notifications being made to parents in Spanish.

87.     Despite the consent decree, in the 2000s, the United States Department of Justice, Civil Rights Division ("DOJ") raised issues regarding the Worcester School District's failure to comply with its obligations to provide adequate bilingual education in accordance with the Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1701 et seq. ("EEOA").  The Worcester School Committee, in order to avoid litigation, approved a settlement with the DOJ, pursuant to which the Worcester School District agreed to take certain actions to "overcome language barriers that impede equal participation by [English Language Learner] students in its instructional programs."  The settlement agreement was executed by the DOJ and the Worcester School District on December 18, 2008.[19]

---

[18] *Latin Association for Progress and Action v. Durkin*, Civil Action No. 78-1150K (D. Mass.).

[19] Settlement Agreement Between the United States of America and the Worcester, MA Public School, (Dec. 18, 2008), *available at* https://www.justice.gov/sites/default/files/crt/legacy/2015/07/09/worcesettle.pdf.

88.     However, even that extreme action was still not enough to motivate the School Committee to implement necessary bilingual education programs in Worcester Public Schools. Four years after entering the Settlement Agreement, the DOJ continued to find that Worcester Public Schools were not complying with their obligations to provide adequate education to English Language Learners.  The parties executed a Supplemental Settlement Agreement on July 10, 2012 pursuant to which Worcester Public Schools agreed to correct the noncompliance.  Four years later, Worcester Public Schools' noncompliance persisted and the parties executed a Successor Settlement Agreement on July 11, 2016, with Worcester Public Schools again agreeing to resolve the lingering noncompliance.

89.     At present, approximately 30% of Worcester's student population are English Language Learners.  However, despite the repeated indication by the DOJ that the Worcester School District had failed to satisfy its obligations under the EEOA, and the Worcester School District's legal commitment to rectify those issues, Worcester Public Schools (governed by the Worcester School Committee) still do not provide adequate bilingual education for its students. For example, Worcester schools still do not provide adequate bilingual student counselors to their students.

90.     Compounding the detrimental impact of the City's failure to provide adequate bilingual education on students of color, the Worcester School District has also increased its police presence in local schools.  Both Hispanic/Latino/a and Black students have been negatively and disproportionately impacted by the increase in police presence in Worcester Public Schools.

91.     Additionally, Hispanic/Latino/a and Black students are more frequently subject to disciplinary measures than their white peers.  As both federal and state authorities have noted in examining disproportionate student discipline at the national level, "research suggests that the

substantial racial disparities … are not explained by more frequent or more serious misbehavior by students of color."[20]  Instead, studies have shown that racial bias and racial stereotypes are often the driver of disproportionate discipline rates.[21]

92.     In Worcester, the disciplinary disparities are staggering.  In the 2018-19 school year, Worcester Public Schools reported that more than 75% of students disciplined with in-school suspensions were Hispanic/Latino/a or Black students: 55.7% were Hispanic/Latino/a students and 19.9% were Black students.   With respect to out-of-school suspensions, 56.2% were Hispanic/Latino/a students and 19.7% were Black students.   Additionally, 31.1% of in-school suspensions and 33.3% of out-of-school suspensions were of English Language Learner students.

93.     With respect to emergency removals from Worcester Public Schools, 55.6% of emergency removals in the 2018-19 school year were of Hispanic/Latino/a students, 20.2% were of Black students, and 30.9% were English Language Learner students.

94.     Hispanic/Latino/a students are disciplined and receive more severe discipline at **double** the rate of their white peers.  Of 11,978 Hispanic/Latino/a students, a total of 1,297 were disciplined during the 2017-2018 school year, according to data from the Massachusetts Department of Elementary and Secondary Education.  Of that discipline, 4.1% were in-school suspensions and 7.3% were out-of-school suspensions.  Comparatively, of 8,082 white students, 453 were disciplined, with only 2% receiving in-school suspensions and 3.6% receiving out-of-

---

[20] Mass. Dep't of Elementary and Secondary Educ., *Advisory on Student Discipline under Chapter 222 of the Acts of 2012* (Feb. 28, 2015, updated and reissued Dec. 23, 2016), https://www.doe.mass.edu/lawsregs/advisory/discipline/StudentDiscipline.html, at Section VIII.
[21] *See, e.g.*, Jason A. Okonofua & Jennifer Eberhardt, *Two Strikes: Race and the Disciplining of Young Students*, 26 Psychological Science 617 (2015), available at https://journals.sagepub.com/doi/10.1177/0956797615570365.

school suspensions.[22]   Again, studies demonstrate that this is the result of racial bias and stereotypes, not the result of more frequent or more serious misbehavior by students of color.

95.    Students also frequently report instances of racism in Worcester Public Schools.  In April 2019, students rallied outside of Worcester City Hall to raise awareness to the issues caused by systemic racism in the Worcester School District.  In a statement, youth organizations made up of Worcester Public School students, the Youth Civics Union, the HOPE Coalition, the Worcester Youth Movement, and the Worcester Youth Cooperative said the district has "failed to address the larger issues of systemic racism that are plaguing our schools."  The students voiced their concern that Worcester Public Schools' leadership have a "flawed" perception of a school system free of racism.[23]

96.    When current and former students of Worcester Public Schools created an Instagram account to publicize anonymously reported incidents of racism in the schools, "the submissions started pouring in."[24]   Descriptions of racial slurs, disproportionate and targeted discipline, and a racially hostile environment were common.[25]   Many recounted their perception

---

[22] Melissa Hanson, *Race, student discipline and sex ed: Contentious year at Worcester Public Schools puts laser focus on Superintendent Maureen Binienda*, Masslive.com, Jun. 21, 2019.

[23] Melissa Hanson, *'Racism is real;' Worcester Public Schools students rally outside City Hall, call for superintendent's contract to not be extended,* MASSLIVE.COM, (Apr. 16, 2019), https://www.masslive.com/worcester/2019/04/racism-is-real-worcester-public-schools-students-rally-outside-city-hall-call-for-superintendents-contract-to-not-be-extended.html.

[24] *See* Melissa Hanson, *On Instagram, Worcester Public Schools students are sharing stories about prejudice, inequality; group of recent graduates running the account is demanding policy change*, MASSLIVE.COM, (Aug. 5, 2020), https://www.masslive.com/worcester/2020/08/on-instagram-worcester-public-schools-students-are-sharing-stories-about-prejudice-inequality-group-of-recent-graduates-running-the-account-is-demanding-policy-change.html (describing "a tidal wave of trauma").

[25] *See id*; *see also* Racism-free WPS, https://www.instagram.com/racismfreewps/, (last visited Jan. 20, 2021).

of an administration that gave short shrift to issues of discrimination and racism experienced by students, and how this affected their education.[26]

**Worcester Communities of Color Bear the Effects of Past Discrimination in Employment**

97.     Similarly, members of minority communities in Worcester, including Hispanic/Latino/a and Black residents, bear the effects of past discrimination in employment, which hinders their ability to participate effectively in the political process.

98.     For example, hiring of employees of color in Worcester Public Schools lags significantly behind those groups' representative proportions in the population as a whole.  By contrast, hiring of whites is proportionally significantly higher than the white population in the City.  The disproportionate hiring of white employees in Worcester Public Schools is particularly dramatic when juxtaposed with the extremely diverse Worcester student population.

99.     As of 2019, Worcester Public Schools consisted of a full-time equivalent of 3,412 employees, which included 2,878 white employees (84.35%), 329 Hispanic employees (9.64%), and 122 Black employees (3.58%).[27]  These numbers are in stark contrast to Worcester's general population which, as noted above, is approximately 21.3% Hispanic/Latino/a and 12.1% Black.  The significant underrepresentation of minority faculty and staff is even more striking in comparison to Worcester's student population, which, as noted above, has even higher percentages of Hispanic/Latino/a (43.1%) and Black (16.9%) students than the city population as a whole.

---

[26] *Id.*

[27] Melissa Hanson, *'Racism is real;' Worcester Public Schools students rally outside City Hall, call for superintendent's contract to not be extended,* MASSLIVE.COM, (Apr. 16, 2019), https://www.masslive.com/worcester/2019/04/racism-is-real-worcester-public-schools-students-rally-outside-city-hall-call-for-superintendents-contract-to-not-be-extended.html.

100.    Worcester is also one of only a handful of Massachusetts municipalities that remains under a federal consent decree governing police hiring, necessitated by the racially discriminatory hiring practices that have historically been implemented.  *See NAACP v Beecher*, 295 F. Supp. 3d 26, 28 n.1 (D. Mass. 2018).

## Elected Officials Are Less Responsive to the Needs of Worcester's Hispanic/Latino/a and Black Communities

101.    The needs of Worcester's minority communities – in particular the Hispanic/Latino/a and Black communities – are often overlooked within the City of Worcester due to their lack of representation on the Worcester School Committee.

102.    To cite one of many examples, community groups have repeatedly advocated for reforms to student discipline practices in the Worcester Public Schools, which has one of the highest student discipline rates in the Commonwealth – disproportionately borne by students of color, as explained above.  Yet these pleas have generally gone unaddressed and the high levels of suspension and expulsion, as well as increased police presence, continue, disrupting education and perpetuating a highly problematic school-to-prison pipeline.

103.    The Coalition for Education Equity, along with several student groups, raised significant concerns to the Worcester School Committee when it was considering renewing the contract of the Superintendent in 2019.  They indicated to the Worcester School Committee that the Superintendent, who had been in the position since 2016, has overseen a school department that had continually put Hispanic/Latino/a and Black students at a disadvantage compared to their white peers, and wielded a heavy-handed approach to dispensing discipline in schools in general. However, the School Committee renewed the Superintendent's contract for an additional three years in May 2019.

104.    As another example, the COVID-19 pandemic has presented numerous challenges to Worcester Public Schools that have highlighted and exacerbated the disadvantages facing students of color, who tend to have less access to educational resources than their white peers.  A September 2020 study by the Worcester Education Justice Alliance ("WEJA"), which included both a quantitative survey and qualitative interviews of Worcester families, found that Worcester families faced four main challenges caused by the COVID-19 pandemic: household challenges (e.g., scheduling concerns and housing and economic insecurity), communication challenges (e.g., inconsistent and ineffective communication from schools and the district and lack of channels for feedback from parents), mental and emotional well-being concerns (e.g., mental health, safety concerns, fear, and health risks of COVID-19), and remote learning challenges (e.g., technology challenges, unplanned and unorganized curriculum, and lack of support for students with special needs).[28]

105.    The results of the survey demonstrated that many parents felt that the school district, under the governance of the Worcester School Committee, failed to adequately address these concerns, particularly as they pertained to the more marginalized minority students.

106.    Another recent example is that in the fall of 2019, Plaintiff NAACP proposed the creation of a residents' advisory commission for the Worcester School Committee as a way to ensure that the voices and experience of Black and other minority groups were heard in the ongoing

---

[28] Worcester Education Justice Alliance, *Worcester Parent Research on Remote Learning During the COVID-19 Pandemic* (Sept. 2020), available at https://issuu.com/activist-scholar/docs/worcester_parent_survey_draft_9.28.20.

debate over the direction of schools.[29]   However, again, this request was unheeded and no such

commission has been implemented.

### The Policy Underlying Worcester's Use of an All At-Large Plurality School Committee Election System is Tenuous

107.    The policy underlying Worcester's at-large plurality voting system both is tenuous

and, as implemented, entrenches majority voting power and excludes minorities from the political

process.   No other large city in the Commonwealth (>100,000 residents) utilizes a School

Committee election system in which all members are elected by an at-large plurality.   This is for

good reason.

108.    As explained above, the historical, socio-economic, and other conditions which

prevail in Worcester have hindered the ability of residents of color to fully participate in the

political process.  Hispanic/Latino/a and Black voters have attempted to overcome these challenges

to elect candidates of their choice, but the entirely at-large plurality election system currently in

place precludes their success.

109.    Maintaining this ineffective system serves only to perpetuate the discrimination that

has plagued the Hispanic/Latino/a and Black communities of Worcester historically.   As a result,

it violates federal law.   There is simply no legal basis or legitimate reason to continue to use a

system that has continually resulted in a Worcester School Committee that does not come

anywhere close to representing or reflecting the diversity of Worcester Public School students or

the City as a whole.

---

[29] Scott O'Connell, *Residents' advisory commission floated for School committee: Group would seek, report on data from school department*, Worcester Telegram & Gazette, Oct. 9, 2019 at B1.

110.    As Congress observed when passing the VRA, quoting the Supreme Court, "there is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth.  The right to vote includes the right to have the ballot counted…. [I]t also includes the right to have the vote counted at full value without dilution or discount…. [T]hat federally protected right suffers substantial dilution … [where a] favored group has full voting strength … [and] the groups not in favor have their votes discounted."[30]  The votes of Hispanic/Latino/a and Black voters in the City of Worcester are simply not counted with the full value that federal legislation requires.

## COUNT I
### Violation of Section 2 of the Voting Rights Act of 1965

111.    Plaintiffs repeat and incorporate herein the allegations set forth in the preceding paragraphs as if fully set forth herein.

112.    As explained above, Defendants' actions and inactions in creating and maintaining the at-large plurality Worcester School Committee election system deny Hispanic/Latino/a and Black voters an equal opportunity to elect representatives of their choice and discriminate against Hispanic/Latino/a and Black voters by diluting the weight of their votes in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.

113.    Unless enjoined by order of this Court, Defendants will continue to act in violation of Section 2 of the Voting Rights Act by administering, implementing, and conducting future elections for the Worcester School Committee using an unlawful at-large electoral system.

---

[30] Senate Report at *20 (citing *Reynolds v. Sims*, 377 U.S. 533, 555 n. 29 (1964))

## COUNT II

### Violation of the Equal Protection Clause of the Fourteenth Amendment

114.   Plaintiffs repeat and incorporate herein the allegations set forth in the preceding paragraphs as if fully set forth herein.

115.   Defendants' actions and deliberate inactions in creating and maintaining the at-large plurality Worcester School Committee election system deny Hispanic/Latino/a and Black voters an equal opportunity to elect representatives of their choice and intentionally discriminate against Hispanic/Latino/a and Black voters by diluting the weight of their votes in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

116.   This has deprived Plaintiffs and other Hispanic/Latino/a and Black voters of their rights to participate in the electoral process on an equal basis with white voters.

## COUNT III

### Violation of Fifteenth Amendment

117.   Plaintiffs repeat and incorporate herein the allegations set forth in the preceding paragraphs as if fully set forth herein.

118.   Worcester's at-large voting system for School Committee elections utilizes a discriminatory winner-take-all voting method and, accordingly, unlawfully deprives and abridges the individual Plaintiffs' and other Hispanic/Latino/a and Black voters' right to vote as guaranteed under the Fifteenth Amendment of the U.S. Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for relief from this Court as follows:

a.      Declare that the use of an at-large plurality system to elect the Worcester School Committee violates Section 2 of the Voting Rights Act, the Fourteenth Amendment to the United States Constitution, and/or the Fifteenth Amendment to the United States Constitution;

b.      Order preliminary and permanent injunctive relief enjoining Defendants, their agents and successors in office, and all persons acting in concert with, or as an agent of, any Defendants in this action, from administering, implementing, or conducting any future elections in Worcester, Massachusetts under the at-large plurality method of election employed for election of the members of the Worcester School Committee;

c.      Order the implementation of a new method of election and districting plan for the Worcester School Committee that complies with Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, the Fourteenth Amendment to the United States Constitution, and the Fifteenth Amendment to the United States Constitution;

d.      Award Plaintiffs their reasonable attorneys' fees, pursuant to statute, and the costs and disbursements of maintaining this action, such as expert fees;

e.      Retain jurisdiction to render any and all further orders that this Court may deem appropriate; and

f.      Order such other relief that the Court deems just and reasonable.

Dated: February 8, 2021

Respectfully submitted,

WORCESTER INTERFAITH, INC.;
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
INC., WORCESTER BRANCH;
CASSANDRA BENSAHIH; JAMES
BERRY; MARITZA CRUZ; HOLLI HILL;
JESSENIA KOLACO; NELLY MEDINA;
RUTH RODRIGUEZ-FAY; and DELIA
VEGA

By their attorneys,

*/s/ Rebecca M. Lecaroz*
Rebecca M. Lecaroz (BBO # 666860)
Wayne F. Dennison (BBO # 558879)
Brian M. Alosco (BBO # 693899)
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Fax: (617) 856-8201
rlecaroz@brownrudnick.com
wdennison@brownrudnick.com
balosco@brownrudnick.com

Oren M. Sellstrom (BBO # 569045)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, Fifth Floor
Boston, MA 02110
Telephone: (617) 988-0608
Fax: (617) 482-4392
osellstrom@lawyersforcivilrights.org